UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------x
TIFFANY SIMONE EVANS,

               Plaintiff,

      -against-                    **MEMORANDUM AND ORDER**
                                      Case No. 16-CV-4560 (FB) (VMS)

METROPOLITAN
TRANSPORTATION AUTHORITY,
MANHATTAN AND BRONX
SURFACE TRANSIT OPERATING
AUTHORITY, ROBERT
SHARROCKS, and NEW YORK CITY
TRANSIT AUTHORITY a/k/a MTA
NEW YORK CITY TRANSIT,

              Defendants.
----------------------------------------------x

*Appearances*

| *For the Plaintiff:* | *For the Defendants:* |
| --- | --- |
| ERIC BAUM, ESQ. | STEVEN GERBER, ESQ. |
| SAGAR SHAH, ESQ. | JEREMY M. WEINTRAUB, ESQ. |
| Eisenberg & Baum, LLP | Schoeman Updike Kaufman & Gerber LLP |
| 24 Union Square East, Fourth Floor | 551 Fifth Avenue, Suite 1200 |
| New York, New York 10003 | New York, New York 10176 |

**BLOCK, Senior District Judge:**

After a four-day trial, the jury in this action found Robert Sharrocks and the New York City Transit Authority ("NYCTA") liable to Tiffany Evans for sex discrimination. It awarded $100,000 in lost wages, $25,000 in non-economic damages, and $7,500 in punitive damages.

1

Sharrocks and NYCTA now move for a new trial pursuant to Federal Rule of Civil Procedure 59(a) and to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e).  In the alternative, they move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).  For the following reasons, the motions are, with one exception, denied.[1]

# I

As the parties are familiar with the facts, the Court summarizes them only as necessary to provide context for the post-trial motions.

Evans, a black woman, began training to become a NYCTA bus driver in March 2015.  Sharrocks, a white man, was one of her instructors.  Evans claimed that, over the course of seven days of training, Sharrocks made disparaging remarks about her based on her sex and race, and about women and people of color generally.  She further claimed that he made unwelcome comments of a sexual nature, rubbed his groin against her leg, and groped her breasts.  Sharrocks denied those claims.

On day seven of the training, Evans failed a driving test overseen by Sharrocks.  She claimed that Sharrocks failed her because she had complained about

---

[1] Prior to trial, defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  That motion is also denied.  *See Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 130 (2d Cir. 1999) ("Once trial began, the summary judgment motion [] effectively became moot." (quoting, with alteration, *Black v. J.I. Case Co.*, 22 F.3d 568, 571 (5th Cir. 1994))).

his inappropriate comments and rebuffed his sexual advances.  Sharrocks claimed that he failed her because she hit a curb while making a left turn.

Evans was then given additional training and a second test by Herbert Gonzalez.  She claimed that she failed the second test because Gonzalez knew about her complaints about Sharrocks and did not believe them.  Gonzalez claimed that he failed Evans because he had to use a "trolley brake" during the test to avoid a collision with a bicyclist.

Evans was given a third test with two instructors present.  She claimed that she failed the third test because one of the instructors, Quintessa Gray, had overheard her making a formal complaint about Sharrocks' conduct.  Gray claimed that she failed Evans because she again hit a curb during the test.

After failing the third test, Evans resigned her position as a bus driver trainee. She later got a job as driver for FreshDirect, making less money than she would have as a bus driver.

The case was presented to the jury as three claims under the New York City Human Rights Law: sex discrimination, race discrimination, and retaliation.  As noted, the jury found for Evans on her sex discrimination claim and awarded a total of $132,500 in damages on that claim.  The jury found against Evans on both the race discrimination claim and the retaliation claim.

**II**

Defendants' post-trial motions raise four issues.  The Court addresses each in turn.

**A.      Prior Complaint Against Sharrocks**

Over the defendants' objection, the Court allowed Evans to call Albert Carpenter as a witness.  Carpenter, a former trainee, testified that Sharrocks had made racially and sexually offensive remarks during his training.  He then made a written complaint about the comments to NYCTA's EEO office.

The Court and counsel extensively discussed the relevance of prior complaints in a discrimination case over the course of the trial.  The Court's principal concern was that the prior complaints would be a textbook example of propensity evidence and "not allowable, unless there [is] some very compelling reason that would take it out of that general rule."  Trial Tr. (Jan. 18, 2018) 271.  But Evans's counsel offered such a reason.

Carpenter's complaint was some evidence that NYCTA had notice of Sharrock's conduct.  Notice, in turn, was relevant to NYCTA's liability; as explained in the Court's jury instruction, an employer is liable for its employee's misconduct "if it would have learned of the conduct in the exercise of reasonable care, and failed to exercise reasonable diligence to prevent it."  Trial Tr. (Jan. 24, 2018) 65.  In making that assessment, the jury could "consider whether the Transit Authority had

4

a record of no, or relatively few, prior incidents of discrimination by Mr. Sharrocks."

*Id.*  The defendants did not object to those portions of the charge.  Thus, contrary to

their argument, the evidence had probative value on a relevant issue.

After admitting an internal NYCTA memoranda summarizing its

investigation of Carpenter's complaint, the Court painstakingly instructed the jury

that it could not consider Carpenter's complaint as corroboration of Evans's

complaint:

> You're going to have to assess her credibility.  In making that
> determination you cannot consider these prior complaints. We don't
> know whether it's true or not. I'm allowing this whole thing to come
> before you because we know that there was an investigation. I don't
> want you to have to speculate about what happened and I thought in
> fairness to everybody you should hear how this investigation process
> unfolds in the context of the obligation of the Transit Authority to
> investigate any complaints of sexual discrimination.  But you're going
> to have to assess the credibility of Ms. Evans separate and apart from
> what you just heard that these other people may or may not have
> said. . . .
>
> Let me tell you why essentially I'm allowing this testimony and this
> report to be in evidence.  So this memorandum I find is admissible as a
> statement by an opposing party. . . . But the EEO memorandum . . .
> itself contains statements of individuals who complained to Mr. Seda
> [NYCTA's EEO officer].  Those statements would be hearsay if they
> were being offered for their truth.  However, they are admissible here
> for the limited purpose of . . . establishing or showing the Transit
> Authority's knowledge of prior complaints against Mr. Sharrocks and
> how it went about handling those complaints.  So you have to just make
> sure that you don't say that because these complaints were received
> before that means that what Ms. Evans said is true. You have to assess
> her credibility separate and apart from these complaints.

Trial Tr. (Jan. 23, 2018) 42-43.  The Court remains satisfied that its limiting instruction was an adequate alternative to exclusion under Federal Rule of Civil Procedure 403.

The defendants argue that Evans' counsel flouted the Court's limiting instruction during his summation.  It is true that counsel began his summation with Carpenter's complaint.  But he confined himself to NYCTA's failure to take action on what he argued was a credible complaint.  *See, e.g.*, Trial Tr. (Jan. 24, 2018) 9 ("[H]ad the Transit Authority, the EEO office, done what it was supposed to do when it received the complaints back in 2014, we would not be here today.").  Once he "turn[ed] to Tiffany's credibility," *id.* at 18, he did not mention Carpenter's complaint.

Plaintiff's counsel crossed the line, however, when he argued in rebuttal that "[t]hree people"—namely Carpenter, one of Carpenter's classmates and Evans— "corroborated that Robert Sharrocks made inappropriate statements and did inappropriate things." *Id.* at 47.  He continues to cite cases for the proposition that prior instances of discriminatory conduct are relevant to a defendant's motive or intent, *see, e.g.*, *Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536 (S.D.N.Y. 2005), but the Court did not admit Carpenter's complaint for that purpose.  The motive behind a facially neutral action like a termination is typically hidden, requiring the plaintiff to offer other evidence of the defendant's hostility for a

6

particular group.  *See id.* at 544 ("[A]n employer's conduct tending to demonstrate hostility towards a certain group is both relevant and admissible where the employer's general hostility towards that group is the true reason behind firing an employee who is a member of that group.").  The conduct attributed to Sharrocks by Evans was explicitly sexual; any probative value in shedding additional light on the obvious was substantially outweighed by the potential prejudice of propensity evidence.

Nevertheless, the Court concludes that the comment did not prejudice the defendants.  "Trial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial."  *Matthews v. CTI Container Transport Int'l Inc.*, 871 F.2d 270, 278 (2d Cir. 1989).  Here, the Court's jury charge—given immediately after the rebuttal summation—included a reprise of the previous limiting instruction and specifically corrected counsel's inappropriate comment:

> I think Mr. Baum made some mention of [corroboration].  No.  It's not corroboration of her testimony.  It's strictly to put the Transit Authority on notice that there were these complaints that were made.  Whether they were true or not, you can't speculate about that.

Trial Tr. (Jan. 24, 2018) 66.

The Court is, as always, confident that the jury understood that the arguments of counsel must yield to the Court's instructions on legal matters.  Curative instructions cannot countermand every improper argument, of course, but they are

7

most effective when they address "precisely the prejudice" at issue. *See United States v. Binday*, 804 F3d 558, 593 (2d Cir. 2015). The Court specifically told the jury to disregard counsel's corroboration argument, and has no reason to think it could not or did not follow that instruction.

Defendants further argue that they were unfairly surprised because Carpenter was not on the plaintiff's witness list. Evans' counsel first tried to elicit evidence of Carpenter's complaint from Sharrocks. The Court sustained defendants' hearsay objection. When Evans's counsel continued to ask Sharrocks about the prior complaint, the Court instructed the jury that "[t]here is no evidence that anybody has made any other complaints here whatsoever," but told Evans's counsel, "You can pull this gentleman in to testify, if you wish to do so." *Id.* at 358-59. The Court adheres to its earlier conclusion that, in the circumstances, the defendants had fair notice that Evans' counsel might try to secure Carpenter as a witness.

## B.    Expert Testimony

Dr. Roy Lubit, a forensic psychiatrist, testified that Evans displayed the symptoms of post-traumatic stress disorder ("PTSD") and depression as a result of her experience during her training. He formed that opinion principally from an in-person interview with Evans.

On cross-examination, defendants' counsel broached the subject of credibility, asking Dr. Lubit, "[I]f the events that she related concerning Mr.

Sharrocks did not happen, then you would not be able to associate her symptoms with events and say that the events were a causal factor, right?"  Trial Tr. (Jan. 18, 2018) 244.  Dr. Lubit agreed:  "If she's lying to me and none of those things occurred, then she would not have PTSD from events because the events didn't occur[.]"  *Id.*

The exchange led the Court to ask Dr. Lubit "to explain why it is that you accepted what she told you." *Id.*  Dr. Lubit gave several reasons, including that "the symptoms she related make sense," "her symptoms do fit a known pattern," "she didn't try to make a point, make an impression that she was so terribly hurt by this," and "[s]he mentioned symptoms that she would not have been likely to have noted unless she actually had PTSD." *Id.* at 246-47

At the conclusion of Dr. Lubit's explanation, the Court gave its reason for eliciting it:  "I just wanted you to explain why it is that you believed that you should accept her story, and whether or not that story is true or not will be for the jury to determine. That's their ultimate responsibility." *Id.* at 248-49.  The Court reiterated the same point in its instructions on expert testimony:

> It's not for the expert to say I believe her or not.  He can report what she said and he can conclude from what she said that he believes that she has PTSD. But whether she's reporting it credibly or not is for you to determine and not for Dr. Lubit or for the court.

Trial Tr. (Jan. 24, 2018) 59-60.

Evans's counsel gave the jury a different view of the law when, during his summation, he said, "Dr. Lubit also gave you an opinion about [Evans's] truth telling. He believed that based on her account that she showed signs of truth telling." *Id.* at 20. When defendants' counsel objected, the Court told the jury, "If somebody tells you something about the law and I tell you something different, you are going to follow my instructions." *Id.*

Defendants argue that the Court should have excluded Dr. Lubit's assessment of Evans's credibility, and that the error was exacerbated by her counsel's summation. In *United States v. Scop*, 846 F.2d 135 (2d Cir. 1988), the Second Circuit held that "even expert witnesses possessed of medical knowledge and skills that relate directly to credibility may not state an opinion as to whether another witness is credible." *Id.* at 142. Thus, in a perfect world, the jury would not have heard that part of Dr. Lubit's testimony. But trials take place in the real world, and the Court is confident that the jury followed its instructions to disregard both Dr. Lubit's credibility assessment and plaintiff's counsel's invitation to the contrary.

Defendants further argue that the Court should have excluded *all* of Dr. Lubit's testimony as "improperly based upon his assessment of and belief in plaintiff's credibility." Defs.' Mem. of Law 19. That is a bridge too far. Dr. Lubit was not asked to opine whether someone going through Evans's experience *might* develop PTSD; he was asked to opine whether Evans *did* develop PTSD. That

10

necessarily required him to consider Evans's credibility because, as he explained, she could not have developed PTSD from the events she described if those events never occurred.

It is true that the majority in *Scop* said that an expert's credibility assessment of a witness "not only should be excluded as overly prejudicial but also renders inadmissible any secondary opinion based upon it." 846 F.2d at 142. Although he concurred based on another problem with the expert's testimony, Judge Pierce disagreed with the majority's sweeping pronouncement: "As I understand it, the expert's reliance on the testimony of a witness whose credibility is in question may be brought out on cross-examination and may not affect the foundation for the admission of the opinion itself." *Id.* at 143. The Second Circuit later called this aspect of *Scops* dicta and essentially embraced Judge Pierce's view. *See In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804, 826 (2d Cir. 1994), *overruled on other grounds by Zicherman v. Korea Air Lines Co.*, 516 U.S. 217 (1996).

Defendants' reading of *Scop* would preclude expert testimony whenever the expert's opinion relies on the veracity of another witness. Yet Federal Rule of Civil Procedure 703 expressly allows an expert to rely on anything—whether admissible in evidence or not—"[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." As a result, courts

11

routinely allow all manner of experts to testify "even though their opinions were based in part on the positive evaluation of the statements of others."  Margaret A. Berger, *United States v. Scop: The Common-Law Approach to an Expert's Opinion About a Witness's Credibility Still Does Not Work*, 55 Brook. L. Rev. 559, 566 (1989) (citing cases).  The Court cannot credit that the majority in *Scop* intended a different result.

**C.    Lost Wages**

At the conclusion of the trial, Evans's counsel requested a jury instruction on lost wages.  The Court initially denied the request, opining that there was insufficient evidence to support it.  Evans's counsel disagreed, "as least as far as the past lost earnings":

> She testified the pay for the Transit Authority was 22 an hour; after the first 30 days, after which she would have been making 25 dollars an hour.  She testified at her present job at Fresh Direct she makes 15 dollars an hour. She testified the amount of hours she works per week.

Trial Tr. (Jan. 23, 2018) 137.  The Court ultimately decided to instruct the jury on past wages—but not future wages—and, if the jury found in her favor on that element of damages, "to take a hard look at it at that time."  *Id.* at 138.

That time has now come.  Evans testified as follows as to her understanding of the wages for an NYCTA bus driver:

> A:     [The person leading Evans's orientation] said that in training you start off with $22 and change. I don't know exactly what it was.

12

> And he said that there would be raises throughout the tenure if
> you were to be employed permanently.

Q:   So what were the increases that you were told?

A:   I think it was something like $25 after you finished the ten-day
     training, then you go on for another 30-day training.  At that time
     you get your badge and you get sworn in. I think it was bumped
     up to $25 or something.

Q:   And did the wage go up over time?

A:   Yeah.

Q:   What does it go up to?

A:   If I remember correctly, I believe it was $35 after five years.

Trial Tr. (Jan. 17, 2018) 80-81.  She later testified that she did not look for work

for a little over a year after resigning from the NYCTA training problem, but that

she has made $15 an hour since August 2017.

Evans's counsel used those figures in his summation to calculate her claimed

lost wages:

> I would like to show you what her lost earning claim was for the period
> of time when she left the training course on April 7, 2015 to the current
> date.  So, had she worked for the Transit Authority she would have
> earned, if you take a look at one, 25 dollars per hour, assuming she
> would have worked 37.5 hours per week, that would have been 937.50
> per week for 116 weeks.  There w[ere] 28 weeks in 2015.  There were
> 52 weeks in 2016 and there were 26 weeks in 2017.  She the total there
> would have been 108,750.
>
> When she started working for Fresh Direct she was making 15 dollars
> an hour.   Assuming she worked 37.5 hours per week at Fresh Direct,
> that would be 562.50 per week versus what she would have earned at

the Transit Authority of 937.50, from July 2017, the difference is 375 dollars per week, which is 10,500 dollars.  If you add the two numbers together, you have 118,750 dollars to the point of this trial, which is a lost earning that she would have had.

Trial Tr. (Jan. 24, 2018) 20-21.

Having perused Evans's testimony, the Court can find no reference to the hours Evans would have worked as an NYCTA bus driver or to the hours she works at FreshDirect.  There is, therefore, insufficient evidence to support her counsel's calculation of her lost wages or that aspect of the jury's award.  The remedy is a judgment as a matter of law in favor of the defendants on that element of damages. *See Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018) ("To warrant post-verdict judgment as a matter of law, the movant must show that the evidence, when viewed most favorably to the non-movant, was insufficient to permit a reasonable juror to have found in the non-movant's favor.").[2]

---

[2] Evans cites the testimony of Omar Valencia, who took the training with her and later became a bus driver.  He testified that he made "over $73,000" in 2016. Trial Tr. (Jan. 18, 2018) 409.  That total, however, included an unspecified amount of overtime; Valencia did not testify as to the number of hours he worked.

14

**D.      Weight of the Evidence**

Finally, the defendants raise a catch-all argument that Evans's uncorroborated version of events was either against the weight of the evidence, entitling them to a new trial, *see Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634 (2d Cir. 2002), or so overwhelmed by contrary evidence that they are entitled to judgment as a matter of law, *see Bucalo v. Shelter Island Union Free School Dist.*, 691 F.3d 119, 127-28 (2d Cir. 2012). The Court concludes that neither standard has been met.

Evans and Sharrocks presented a classic "she said, he said," which the jury could have sensibly resolved in either's favor. That other witnesses corroborated Sharrocks' story does not alter the analysis. The Court's standard instruction on the burden of proof in a civil case tells the jury that the preponderance of the evidence "does not mean the greater number of witnesses" but, rather, "is based on the quality and persuasiveness of the evidence, that is, the weight and effect it has on your minds." Trial Tr. (Jan. 24, 2018) 60. The same should hold true for a court's post-trial review of the evidence. The jury could have reasonably concluded that Evans's story was convincing enough to stand on its own, or that the other witnesses—all current NYCTA employees—had a motive, whether conscious or not, to corroborate Sharrocks's story.

### III

Defendants' motion for judgment as a matter of law is granted with respect to the jury's award of lost wages and otherwise denied. Their motion for a new trial is denied.

**SO ORDERED**.

_/S/ Frederic Block_
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 25, 2018

16